UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

M.B., *an infant by parent and natural guardian*
MAUREEN SCOTT; and MAUREEN SCOTT,
*individually*,

                          Plaintiffs,

                                                    1:12-CV-0825
v.                                                  (GTS/RFT)

CSX TRANSPORTATION, INC.,

                          Defendant.
_____

APPEARANCES:                              OF COUNSEL:

RUSSO & TONER, LLP                        STEPHEN B. TONER, ESQ.
  Counsel for Plaintiffs
33 Whitehall Street, 16th Floor
New York, New York 10004

ECKERT SEAMANS CHERIN & MELLOT, LLC       LAWRENCE R. BAILEY, JR., ESQ.
  Counsel for Defendant
10 Bank Street, Suite 700
White Plains, New York 10606

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this personal injury action filed by M.B. and Maureen

Scott, individually and as parent and natural guardian of M.B. ("Plaintiffs") against CSX

Transportation, Inc. ("Defendant"), are Defendant's motion for summary judgment and

Defendant's motion to preclude the use of the opinions of Plaintiffs' liability expert, Nicholas

Bellizzi, in opposition to Defendant's motion for summary judgment and at trial. (Dkt. Nos. 49,

50.) For the reasons set forth below, Defendant's motion to preclude is granted and the motion

for summary judgment is granted.

# I.     BACKGROUND

## A.     Procedural History

This action was originally commenced in New York State Supreme Court, County of Ulster, on or about March 23, 2012.  (Dkt. No. 1.)  Generally, the Complaint alleges that on November 27, 2010, while crossing railroad tracks located in Kingston, New York, M.B. was struck and injured by a train owned and carelessly operated by Defendant.  (Dkt. No. 1, Attach. 1, at ¶¶ 10-18 [Pls.' Compl.].)  Based on these factual allegations, the Complaint sets forth two causes of action: (1) negligence; and (2) the loss of M.B.'s services, love, companionship, and support.  (*Id*. ¶¶ 19, 21.)  Pursuant to 28 U.S.C. § 1332(a), this lawsuit was removed to the Northern District of New York on the basis of diversity jurisdiction.  (Dkt. No. 1.)

Over the following two years, this matter endured a prolonged discovery process in which the original discovery deadline date of July 31, 2013, was extended several times until discovery was finally completed on May 16, 2014.  (Dkt. Nos. 13, 19, 25, 30, 43, 47.)  This delay was apparently caused by Plaintiffs' failure to comply with discovery deadlines and timely serve expert reports, culminating in sanctions[1] being levied against them by United States Magistrate Judge Randolph F. Treece.  (Dkt. No. 43.)  On May 12, 2014, Mr. Bellizzi was finally deposed and on June 20, 2014, Defendant filed the current motions.

---

[1]     These sanctions included awarding costs to Defendant associated with filing a motion to preclude the use of the opinions of Plaintiffs' experts and all costs related to producing Mr. Bellizzi for a deposition by the Defendant.  (Dkt. No. 43, at 16-17.)  In addition, Magistrate Judge Treece precluded M.B.'s orthopaedic surgeon from testifying as an expert and placed limits on what he could testify to as a fact witness.  (*Id*. at 17.)

**B.     Statement of Undisputed Material Facts**

The following material facts have been asserted and supported by Defendant in its Statement of Material Facts, and not denied in matching numbered paragraphs with supporting record citations by Plaintiffs in their response thereto, and thus admitted pursuant to Local Rule 7.1 of the Local Rules of Practice for this Court.  (*Compare* Dkt. No. 56 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 58, Attach. 2 [Pls.' Rule 7.1 Response].)

1.     At the time of the accident, Plaintiff, M.B., was approximately thirteen years and ten months old.

2.     The railroad tracks where the accident occurred are near Greenkill Avenue, south of Broadway Bridge, in Kingston, New York.

3.     The accident occurred at approximately 2:30 p.m. in broad daylight on November 27, 2010, when a CSX train traveling in a southerly direction made contact with M.B.

4.     Before the accident and at the point of impact, the train was traveling at approximately 38 miles per hour.  (*Compare* Dkt. No. 56, ¶ 8 [Def.'s Rule 7.1 Statement, asserting above-stated fact and citing record evidence that establishes fact] *with* Dkt. No. 58, Attach. 2, at ¶ 8 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

5.     The train's speed of 38 miles per hour was within the authorized speed (50 mph) of CSX's Albany Division Timetable for freight trains at the location of the accident and within the maximum allowable operating speed (60 mph) for freight trains on a Class 4 track.

6.     Before the collision, M.B. ran across the railroad right-of-way toward the railroad track in an attempt to beat the train.

7.      While attempting to cross the railroad tracks, M.B. tripped and fell.

8.      Before contact, Russell Clark, the CSX train engineer, blew the train's horn and rang the train's bell to provide a warning to M.B. and to warn M.B. to get out of the way.

9.      Indeed, the train gave audible warnings through either the train's horn or train's bell for approximately two (2) minutes and twenty (20) seconds before the point of impact with M.B. and continued to do so up until the time the train came to a complete stop after the accident.

10.     Before November 27, 2010, M.B. was fully aware that trains would use the railroad tracks on a regular basis at the location of the accident.  In addition, M.B. knew that train tracks are dangerous.

11.     Before the day of the accident, Mr. Clark had never seen any pedestrians, individuals or trespassers cross the railroad tracks at this location.

### C.      Expert Reports

#### 1.      Plaintiffs' Expert–Nicholas Bellizzi

According to Mr. Bellizzi's *curriculum vitae*, he is a professional engineer licensed in both New York and New Jersey.  (Dkt. No. 58, Ex. A., at 23.)  Although Mr. Bellizzi also states he is an accident reconstructionist, he has not received accreditation or any other form of certification in the area of accident reconstruction.  (*Compare* Dkt. No. 58, Ex. A, at ¶ 1 [Bellizzi Decl.] *with* Dkt. No. 50, Attach. 3, at 19:4-22 [Bellizzi Dep.].)

After reviewing the evidence, Mr. Bellizzi rendered the following opinions.  The train consisted of 136 cars, including "73 loads [and] 63 empties," which amounted to a combined weight of 11,483 tons and extended to a combined length of 8,480 feet.  (Dkt. No. 50, Attach. 2,

at 4.)  The train was initially traveling at 38 mph, or 55.7 feet per second, as it approached the point of impact.  (Dkt. No. 50, Attach. 2, at 7.)  The interval between the time that M.B. first became visible to the train crew inside the locomotive cab and the time that the locomotive struck M.B. was approximately five seconds.  (*Id.*)  During these five seconds, the train traveled approximately 278.5 feet.  (*Id.*)  The train operator blew the train's horn approximately two (2) seconds after M.B. became visible and was blown for approximately five-and-a-half seconds (5 ½) in total.  (*Id.*)  The train's throttle went into idle approximately four (4) seconds after impact and the train's emergency brakes were applied approximately eleven (11) seconds after impact.[2] (*Id.* at 7-8.)  The train was traveling at 36 mph when the brakes were applied. (*Id.* at 7.)  The train came to a complete stop fifty-four (54) seconds after M.B. was first visible and thirty-nine (39) seconds after the brakes were applied.  (*Id*. at 8.)  The train's average brake deceleration rate was slightly less than one mph per second (36 mph/39 seconds = .923 mph per second), which is 1.35 feet per second. (*Id.*)

According to Mr. Bellizzi, a train operator's perception reaction time ("PRT"), which is the total elapsed time from when an object or person is detected to applying the train's brake, is 1.0 to 1.2 seconds. (*Id.*)  This PRT was calculated based upon Mr. Bellizzi's prior experience "in numerous similar train accident cases." (*Id.* at 7-8.)  Based on this PRT, he opined that, had the train operator (Russell Clark) applied the train's brakes 1.2 seconds after M.B. first came into view, the train would have arrived at the point of impact .27 seconds later, which would have

---

[2]       Based upon Mr. Bellizzi's review of the train's event data recorder and digital video recorder ("DVR"), Mr. Bellizzi notes that M.B. disappears from view, after falling on the track, at 14:29:04 on the DVR. (Dkt. No. 50, Attach. 2, at 6.)  Mr. Bellizzi then notes that the throttle is in idle beginning at 14:29:08 (14:29:04 – 14:29:08 = 4 seconds) and the emergency brakes were applied at 14:29:15 (14:29:04 – 14:29:15 = 11 seconds).

been enough time for M.B. to clear the train's path.[3]  (*Id.* at 8-9.)

## 2. Defendant's Expert–Foster Peterson

According to Mr. Peterson's expert report, he has a degree in mechanical engineering and has held a variety of positions in the locomotive industry, including as a certified locomotive engineer, and has operated numerous passenger and freight trains.  (Dkt. No. 50, Attach. 4, at 1 [Peterson Expert Report].)

After reviewing the evidence, Mr. Peterson rendered the following opinions.  M.B. was visible approximately four to five seconds before impact.  (Dkt. No. 50, Attach. 4, at 6 [Peterson Expert Report]; Dkt. No. 50, Attach 4, ¶ 12 [Peterson Aff.].)  Furthermore, the train was traveling at 38 mph immediately before the collision with M.B.  (Dkt. No. 50, Attach. 4, at 4 [Peterson Expert Report]; Dkt. No. 50, Attach 4, ¶ 12 [Peterson Aff.].)  Two (2) seconds before the collision, the train's engineer sounded the train's horn.  (Dkt. No. 50, Attach. 4, at 6 [Peterson Expert Report]; Dkt. No. 50, Attach 4, ¶ 12 [Peterson Aff.].)  In addition, the train's bell had been activated approximately two (2) minutes and twenty (20) seconds before impact and remained activated continuously until impact.  (Dkt. No. 50, Attach. 4, at 6 [Peterson Expert Report]; Dkt. No. 50, Attach 4, ¶ 15 [Peterson Aff.].)  According to Mr. Peterson's review of the

---

[3]      Specifically, Mr. Bellizzi states that a train traveling at 38 mph, or 55.7'/sec, will travel 66.8 feet in 1.2 seconds (55.7'/sec x 1.2 sec = 66.84).  Therefore, if Mr. Clark had applied the train's brakes in 1.2 seconds slightly before he blew the train's horn, the train would have been 211.7 feet (278.5' − 66.8') away from M.B. at the point the brakes were applied.  According to Mr. Bellizzi, the average deceleration rate of the train was 1.35 feet per second.  Using 3.8 seconds as the time when the brakes should have been applied (5 seconds [when M.B. first came into view] − 1.2 seconds [PRT] = 3.8), the train would have slowed to a speed of 50.6 feet per second (1.35'/sec x 3.8 sec = 5.1'/sec, 55.7'/sec − 5.1'/sec = 50.6'/sec).  Thus, by braking and slowing the train to a speed of 50.6'/sec from the 3.8 seconds prior to impact, the train would have been 13.5 feet away from the point of impact at 50.6'/sec and decelerating.  As a result, the train would have arrived at the point of impact a minimum of .27 seconds later (13.5' ÷ 50.6'/sec = .27 sec).  (Dkt. No. 50, Attach. 2, at 8; Dkt. No. 58, Ex. A, at 20-21 [Bellizzi Decl.].)

train's event recorder, M.B. was struck by the train at approximately 14:29:04. (Dkt. No. 50, Attach. 4, at 6 [Peterson Expert Report].)  The train's throttle was shut off at 14:29:08, or approximately four (4) seconds after impact, and a service brake reduction was applied at 14:29:09, or approximately five (5) seconds after impact.  (Dkt. No. 50, Attach. 4, at 4 [Peterson Expert Report].)  The emergency brake was then applied at 14:29:14, or approximately ten (10) seconds after impact. (*Id.*)

In contrast to Mr. Bellizzi's opinion, Mr. Peterson opines that, based upon his experience, the PRT for a train operator is 1.5 to 2.5 seconds.  (Dkt. No. 50, Attach 4, ¶ 13 [Peterson Aff.].)  Mr. Peterson also takes exception to Mr. Bellizzi's use of an average deceleration time over the entire stop in performing his calculations.  (*Id.* ¶ 9.)  According to Mr. Peterson, average deceleration "assumes linear, or constant, deceleration and ignores the physics of train braking." (*Id.*)  Rather, Mr. Peterson states that an

> emergency brake application has to propagate through the brake pipe (at approximately 930 feet per second in emergency) and the brake cylinder pressure must build up on the cars which would take approximately 10-12 seconds after the emergency application is recognized by the car's control valve.  Actual train stops thus exhibit non-linear deceleration, not linear or 'average' as used by Mr. Bellizi (sic).

(*Id.*; Dkt. No. 50, Attach. 4, at 7 [Peterson Expert Report].)

In support of his opinion, Mr. Peterson cites the data contained in the event recorder, which, according to Mr. Peterson, "clearly demonstrates that four (4) seconds after the emergency brake in this train was applied or after the initial throttle reduction and service braking, a maximum reduction in speed of only 1 mph would occur." (*Id.*)  Therefore, Mr. Peterson opines that, "even had engineer Clark applied the train brakes in emergency instantly at the time when M.B. was possibly visible (approximately 4 to 5 seconds before impact), the train

was only approximately 225 to 280 feet away and the train's arrival could not have been measurably delayed." (Dkt. No. 50, Attach. 4, at 7 [Peterson Expert Report]; Dkt. No. 50, Attach 4, ¶ 10 [Peterson Aff.].)

## II. PARTIES' ARGUMENTS ON DEFENDANT'S MOTIONS

### A. Parties' Briefing on Defendant's Motion for Summary Judgment

#### 1. Defendant's Memorandum of Law-in-Chief

Generally, Defendant makes six arguments in support of its motion for summary judgment. (Dkt. No. 49, Attach. 23, at 2-25 [Def.'s Mem. of Law].) First, Defendant argues that it had no legal duty to stop the train at the time and in the manner alleged by Plaintiffs. (*Id.* at 2-8.) Second, Defendant argues that any claim by Plaintiffs regarding the train's speed and movement is preempted by federal law. (*Id.* at 8-11.) Third, Defendant argues that M.B.'s conduct in attempting to "beat the train" was so egregious that it negates any causal connection between the acts of CSX and the cause of the accident. (*Id.* at 11-17.) Fourth, Defendant argues that M.B. assumed the risk of his own conduct when he attempted to cross the railroad tracks in the face of an oncoming train. (*Id.* at 17.) Fifth, Defendant argues that its failure to erect warning signs or fencing was not the proximate cause of the accident. (*Id.* at 18-22.) Sixth, and finally, Defendant argues that Plaintiffs are barred from recovery due to M.B.'s unlawful entry onto CSX's property in violation of N.Y. R. R. Law § 83. (*Id.* at 22-25.)

#### 2. Plaintiffs' Opposition Memorandum of Law

Generally, in response to Defendant's motion for summary judgment, Plaintiffs argue that there exists a "battle of experts" such that issues of fact are present and summary judgment should therefore be denied. (Dkt. No. 58, Attach. 1, at 12-16 [Pls.' Opp'n Mem. of Law].)

### 3. Defendant's Reply Declaration

Generally, in reply to Plaintiffs' opposition, Defendant notes that Plaintiffs have failed to respond to the majority of Defendant's arguments set forth in its memorandum of law. (Dkt. No. 60, ¶¶ 3, 5, 7, 13 [Def.'s Reply Decl.].) Next, Defendant argues that CSX had no duty to take any emergency action to slow down the train upon first observing M.B. emerge from the wooded area. (*Id.* ¶¶ 8-16.) In addition, Defendant notes that, although Plaintiffs claim they are not arguing that the train engineer should have made an emergency application of the brakes but that he should have merely slowed down the train, Mr. Bellizzi opines that the only way to have prevented the accident was to apply the emergency brakes as soon as M.B. was observed. (*Id.* at 3, n.1.) Finally, Defendant reiterates its argument that M.B. recklessly attempted to beat the train, which was the sole proximate cause of the accident. (*Id.* ¶¶ 17-22.)

### B. Parties' Briefing on Defendant's Motion to Preclude

### 1. Defendant's Memorandum of Law-in-Chief

Generally, Defendant makes four arguments in support of its motion to preclude the testimony of Mr. Bellizzi. (Dkt. No. 50, Attach. 6 [Def.'s Mem. of Law].) First, Defendant argues that Mr. Bellizzi's opinions in regard to the CSX engineer's alleged failure to timely apply the train brakes and his purported failure to take reasonable and preventative action do not satisfy the *Daubert* standards of reliability. (*Id.* at 3-11.) Specifically, Defendant argues that these opinions are not based on any studies, data, or facts and there is too great an analytical gap between their supposed methodology and the opinion offered. (*Id.*)

Second, Defendant argues that Mr. Bellizzi's opinion that CSX was negligent due to its failure to fence the area along the railroad tracks and the engineer's failure to immediately apply the emergency brake is unreliable under *Daubert* because it is not based on any studies, data, or facts. (*Id.* at 12-13.)

Third, Defendant argues that Mr. Bellizzi's failure to take New York law into consideration, such as the point of law that a train engineer is not required to apply the emergency brake merely upon sight of a person approaching the track and the point of law that a railroad is not required to fence an area along its tracks to prevent access to trespassers, disqualifies him from testifying or opining in this matter.  (*Id.* at 14.)  Moreover, Defendant argues that, because Mr. Bellizzi has never operated a train and has ignored the proper methodology to calculate the deceleration of a train, he is not qualified to testify as an expert involving railroad collisions.  (*Id.*)  In support of this argument, Defendant cites four New York State Appellate Division cases in which Mr. Bellizzi's opinions were questioned and/or excluded.[4]  (*Id.* at 14-18.)

Fourth, and finally, Defendant argues that Mr. Bellizzi must be precluded from offering any opinions that were not part of his expert report.  (*Id.* at 18-21.)  Specifically, Defendant argues that Mr. Bellizzi testified at his deposition regarding whether CSX was negligent in failing to erect fencing and warning signs along the railroad tracks and whether the train should have been traveling at 30 mph because it was moving through an open urban area.  (*Id.* at 19.)  Defendant argues that none of these opinions were mentioned in Mr. Bellizzi's report and they should therefore be precluded.  (*Id.* at 18-21.)

### 2. Plaintiffs' Opposition Memorandum of Law

Generally, in response to Defendant's motion to preclude, Plaintiffs argue that there is no basis to preclude Mr. Bellizzi as an expert and that only a conflict exists between the experts'

---

[4]        These cases are the following: *Mirjah v. NYCTA*, 48 A.D.3d 764 (N.Y. App. Div. 2d Dept. 2008); *Dibble v. NYCTA*, 76 A.D.3d 903 (N.Y. App. Div. 1st Dept. 2010); *Kim v. NYCTA*, 27 A.D.3d 332 (N.Y. App. Div. 1st Dept. 2006); and *Bacic v. NYCTA*, 64 A.D.3d 526 (N.Y. App. Div. 2d Dept. 2009).

respective opinions, which should be resolved by a jury. (Dkt. No. 58, Attach. 1, at 5-12 [Pls.' Opp'n Mem. of Law].) Specifically, Plaintiffs argue that Defendant has not proffered any evidence to contest Mr. Bellizzi's qualifications. (*Id.* at 5-6.) Therefore, according to Plaintiffs, the Court must determine whether Mr. Bellizzi's opinions are sufficiently reliable and relevant. (*Id.* at 6.)

In this regard, Plaintiffs argue that, although Mr. Bellizzi draws on his personal experience in formulating his opinions, Defendant's expert does so as well, and that this is an issue of credibility rather than of admissibility. (*Id.* at 6-7, 9.) Plaintiffs argue that an expert is not required to provide published studies, or other textual support, that unequivocally support his or her conclusions. (*Id.* at 8-10.)

Next, Plaintiffs argue that strict adherence to *Daubert* is not a requirement for admissibility. (*Id.* at 9-12.) Rather, Plaintiffs argue that Mr. Bellizzi "restricted his observations and conclusions to the express area of train operation with an admixture of his own 'personal knowledge and experience' to formulate his calculations, none of which were remotely conclusory or speculative." (*Id.* at 10.) Furthermore, Plaintiffs argue that Mr. Bellizzi has not "ventured randomly beyond his field of expertise in some unwarranted fashion." (*Id.*) Accordingly, Plaintiffs argue that a "rudimentary analysis of the calculations upon which plaintiff's expert rendered his opinion should be sufficient to withstand the type of gate-keeper scrutiny contemplated by *Daubert* and *Kumho*." (*Id.* at 12.)

### 3. Defendant's Reply Declaration

Generally, in reply to Plaintiffs' opposition, Defendant asserts the following arguments. (Dkt. No. 60 [Def.'s Reply Decl.].)[5] First, Defendant argues that Plaintiffs have failed to address

---

[5]     On June 23, 2014, the Court gave Defendant leave to file a reply on this non-dispositive motion. (Text Notice filed June 23, 2014.)

the New York Appellate Division cases in which Mr. Bellizzi's opinions were precluded. (*Id.* ¶¶ 3, 5.) Second, Defendant argues that, in order for the Court to find a question of fact based on conflicting expert opinions, "there must be an opposing opinion which is legally cognizable, reliable and based on the facts and reliable science." (*Id.* ¶ 4.) According to Defendant, Mr. Bellizzi's opinion does not meet any of these requirements. (*Id.*)

Finally, Defendant repeats its argument that Mr. Bellizzi's opinion regarding the purported ability of M.B. to extricate himself from danger if he had 0.27 seconds of additional time must be precluded for three reasons. (*Id.* ¶ 7.) First, Defendant argues it had no legal duty to take any action when Plaintiff was first observed. (*Id.*) Second, Defendant argues that Mr. Bellizzi's "speculation that if the brakes were applied at that particular time, the train would have arrived at the point of impact 0.27 of [a] second later[,] is not factually and scientifically valid." (*Id.*) Third, and finally, Defendant argues there is no scientific basis for the opinion that, in 0.27 of a second, M.B. could have extricated himself from danger. (*Id.*)

## III.     APPLICABLE LEGAL STANDARDS

### A.     Standard Governing Admissibility of Expert Testimony

Pursuant to Fed. R. Evid. 702, which governs the admissibility of expert testimony,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In reviewing the admissibility of expert testimony, "the district court has a 'gatekeeping' function under Rule 702–it is charged with 'the task of ensuring that an expert's

testimony both rests on a reliable foundation and is relevant to the task at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 [1993]). The rule set forth in *Daubert* applies to technical or other specialized knowledge, as well as scientific knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

As the Second Circuit has explained,

> [i]n fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Amorgianos*, 303 F.3d at 265-66 (internal alterations, quotation marks, and citations omitted).

Furthermore,

> [t]he Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Id.* at 266 (internal quotation marks and citations omitted). However, "[t]hese factors do not

constitute . . . a 'definitive checklist or test,'" and "'[t]he inquiry envisioned by Rule 702 is . . . a flexible one.'" *Id.* (quoting *Daubert*, 509 U.S. at 593-94). The court must also consider the fact that "experience in conjunction with other knowledge, skill, training or education . . . [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, Advisory Committee's Note; *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266 (citations omitted). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 267. "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* "The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id.* (internal quotation marks and citation omitted). Accordingly, "gaps or inconsistencies" in an expert's reasoning, or arguments that an expert's conclusions are wrong, "go to the weight of the evidence, not to its admissibility." *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (citations omitted). "Likewise, disputes regarding the nature and strength of an expert's credentials, an expert's use or application of his or her methodology, or the existence or number

of supporting authorities for an expert's opinion go to the weight, not the admissibility of the expert's testimony." *Cruz v. Kumho Tire Co.*, 10-CV-0219, 2015 WL 2193796, at *5 (N.D.N.Y. May 11, 2015) (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 [2d Cir. 1995]).

As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) ("[B]y loosening the strictures on scientific evidence . . . , *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence."). This presumption "recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267. As the Supreme Court has noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 609 U.S. at 596.

However, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. Furthermore, "it is critical that an expert's analysis be reliable at every step." *Id.* at 267. Thus, while the court's focus is on the expert's principles and methodology, "conclusions and methodology are not entirely distinct from one another." *Glen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," and "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

**B.      Standard Governing a Motion for Summary Judgment**

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  As a result, "[c]onclusory allegations, conjecture and

speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d

396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2).  As the Supreme

Court has famously explained, "[the non-moving party] must do more than simply show that

there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  As for the materiality requirement, a dispute

of fact is "material" if it "might affect the outcome of the suit under the governing law."

*Anderson*, 477 U.S. at 248.  "Factual disputes that are irrelevant or unnecessary will not be

counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movign party.  *Anderson*, 477 U.S. at

255.  In addition, "[the moving party] bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of the . . . [record] which it

believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*,

477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c), (e).  However, when the moving

party has met this initial burden of establishing the absence of any genuine issue of material fact,

the nonmoving party must come forward with specific facts showing a genuine dispute of

material fact for trial. Fed. R. Civ. P. 56(c), (e). Where the non-movant fails to deny the factual assertions contained in the movant's Rule 7.1 Statement of Material Facts in matching numbered paragraphs supported by a citation to admissible record evidence (as required by Local Rule 7.1[a][3] of the Court's Local Rules of Practice), the court may not rely solely on the movant's Rule 7.1 Statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143, n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

Finally, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## IV. ANALYSIS

### A. Defendant's Motion to Preclude

#### 1. Whether Mr. Bellizzi's Opinion Regarding the Train's "Average Deceleration Rate" Is Reliable

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's memorandum of law and Defendant's Reply Declaration.

(Dkt. No. 50, Attach. 6, at 3-13 [Def.'s Mem. of Law]; Dkt. No. 60, ¶¶ 6-14 [Def.'s Reply Decl.].) To those reasons, the Court adds the following analysis.

As discussed above, Mr. Bellizzi applies an "average deceleration rate" in determining that the train would have decelerated at the rate of .923 mph per second, or 1.35 feet per second, once the train's brakes were applied. (Dkt. No. 50, Attach. 2, at 7-8 [Bellizzi Expert Report]; Dkt. No. 58, Ex. A, at ¶ 11 [Bellizzi Decl.].) Defendant argues that this opinion is unreliable and not based upon proper methodology. (Dkt. No. 50, Attach. 6, at 3-11.) Moreover, Defendant argues that an average deceleration rate "ignores the actual physics of train braking wherein when the brake application is made, the air has to propagate through the brake pipe." (Dkt. No. 50, Attach. 6, at 5.)

The Court agrees that Mr. Bellizzi's opinion regarding the train's deceleration is unreliable. First, Mr. Bellizzi's opinion that the train would have decelerated at the rate of .923 per second is contrary to the objective evidence. Specifically, the data from the event recorder and DVR indicates that, when the train's emergency brakes were applied after the collision with M.B., approximately four (4) seconds elapsed *before* the train's speed decreased by one mph.[6] Mr. Bellizzi fails to explain why his calculation does not account for an initial delay when the brakes are applied. This failure occurs despite the fact that Mr. Bellizzi acknowledged during his deposition that, in order for the brakes to take effect, air has to travel through the brakes of

---

[6] The Court notes that the data from the event recorder was not provided by the parties for the Court's review. Therefore, the Court relies, in part, on "Table 1" in Mr. Peterson's expert report. (Dkt. No. 50, Attach. 4, at 6.) This table summarizes Mr. Peterson's interpretation of the data contained in both the DVR and event recorder. (*Id.*) The table notes that, at 14:29:14, the train was traveling at 36 mph when the emergency brake was applied. (*Id.*) The train's speed eventually dropped to 35 mph at 14:29:18, or roughly four seconds later. (*Id.*) In addition, the Court relies on the DVR, which confirms this delay. Plaintiffs have not disputed this evidence in their responses to the instant motions.

the individual train cars and the brake cylinder pressure has to build up.  (Dkt. No. 50, Attach. 3, at 70:12-17, 75:17-22 [Bellizzi Dep.].)  However, Mr. Bellizzi did not bother to determine how fast the air traveled or how long it takes for the brake cylinder pressure to build on a train that is 1.61 miles long.  (*Id.* at 70:18-20, 75:23-76:2.)

Similarly, Mr. Bellizzi admitted he had not seen the specific brake diagrams for the train when asked whether he knew "how the brakes on a freight train of this type with this number of locomotives with this number of cars, work?"  (*Id.* at 69:23-70:6.)  Rather, Mr. Bellizzi stated that the train used air brakes and that he had gleaned some information from Mr. Clark's deposition transcript indicating that, when the brakes are applied, air moved simultaneously from both the rear and front ends of the train to expedite the braking process.  (*Id.*)  Finally, Mr. Bellizzi did not take into account either the length of the train (~1.6 miles), its weight (11,483 tons), or how fast the air traveled through the brake system when calculating the average deceleration rate.  (*Id.* at 70:21-71:3.)

As indicated above in Part III.A. of this Decision and Order, the Court is mindful that it must remain flexible in evaluating the admissibility of an expert's opinions.  However, other than performing a rudimentary analysis of the math used in Mr. Bellizzi's calculations (i.e., ensuring Mr. Bellizzi's math is correct), the Court is unable to determine a basis that supports Mr. Bellizzi's methodology.  Specifically, Mr. Bellizzi agrees that air needs to travel through all of the train cars and the brake cylinder pressure has to build up before there is effective braking power.  However, Mr. Bellizzi opines that the train will begin to decelerate one mph per second as soon as the brakes are applied and does not offer any explanation why this is so.  *See In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (holding that where "relevant scientific literature contains evidence tending to refute the expert's theory and the

expert does not acknowledge or account for that evidence, the expert's opinion is unreliable."). Perhaps most damaging to Mr. Bellizzi's opinion is that both the DVR and the event recorder *establish* that the train needed the first four seconds after the brakes were applied before its speed decreased by one mph. This need for deceleration occurred on the same track and approximately ten seconds after the collision with M.B. (*See* Dkt. No. 50, Attach. 4, at 6 [Peterson Expert Report].)

Notwithstanding this contrary evidence, the Court would be, of course, amenable to allowing Mr. Bellizzi's opinion to be presented to a jury. However, Mr. Bellizzi fails to point to any studies or literature demonstrating that the average deceleration rate is an appropriate method for determining the train's deceleration rate under the circumstances of this case. This failure–coupled with the fact that Mr. Bellizzi admitted he did not consider the train's considerable length and weight, did not consider the time it would take for the air to travel through the individual cars or for the brake cylinder pressure to build up, and did not take the time to familiarize himself with the train's brake system (beyond reading Mr. Clark's deposition transcript)–further places Mr. Bellizzi's opinion on shaky ground. In other words, Mr. Bellizzi has performed a basic calculation of the train's "average deceleration rate" without providing any support regarding its reliability or reasons why it should be applied in this case. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) (noting that, "even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*"). Accordingly, the Court finds that Plaintiffs have failed to establish that Mr. Bellizzi's opinion regarding the train's average deceleration rate is based upon proper methodology and is sufficiently reliable to be admissible in this case.

### 2. Whether Mr. Bellizzi's Opinion Regarding a Train Operator's Perception Reaction Time Is Admissible

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 50, Attach. 6, at 5-6, 14-17 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

Mr. Bellizzi's expert report states that "[t]rain operator reaction time (PRT), which is the total elapsed time from when an object or person is detected to applying the train's brake is 1.0-1.2 seconds, based upon my prior experience in numerous similar train accident cases." (Dkt. No. 50, Attach. 2, at 7-8 [Bellizzi Expert Report].) As Defendant notes, Mr. Bellizzi's opinion regarding a train operator's PRT has been rejected by New York state appellate courts. *See Dibble v. NYCTA*, 76 A.D.3d 272, 279-280 (N.Y. App. Div. 1st Dept. 2010); *Mirjah v. NYCTA*, 48 A.D.3d 764 (N.Y. App. Div. 2d Dept. 2008). In *Dibble*, a train collided with a pedestrian who was laying on subway tracks. *Dibble*, 76 A.D.3d at 273. Mr. Bellizzi was called as plaintiff's expert to support the argument that, had the train operator reacted quicker in applying the train's brakes, the train would have stopped before striking plaintiff. *Id.* at 275. In support of this argument, Mr. Bellizzi applied an average reaction time of one second to the train operator. *Id.* The First Department rejected this proposition, stating

> the record does not reflect that the plaintiff's expert provided any foundation or evidentiary support for his observation that the average reaction time of a train operator is one second. Much less was it established as the average reaction time for nonnegligent train operators.
>
> Bellizzi acknowledged that, in this case as in the cases of hundreds of other plaintiffs for whom he has testified, he uses one second for a train operator's reaction time even though he has never seen or conducted a study of reaction times of train operators . . . [t]he paucity of research on train operator reaction times

> notwithstanding, on cross-examination, Bellizzi testified to *choosing* one second because "that's a reasonable average reaction time" of train operators.

*Id.* at 280. Furthermore, the court recognized that "it is self-evident that if the average reaction time is deemed to be one second for train operators, then a number of all operators will have a reaction time of less than one second, and correspondingly a number of all train operators a reaction time of more than one second." *Id.* The court then pointed out that "nothing in the record indicates where [the defendant train operator] might be found along that spectrum." *Id.* Moreover, Mr. Bellizzi acknowledged that "reaction time also may be affected on any particular occasion by factors such as age and vision and other variables such as lighting or weather or time of day" but did not make any effort to apply those factors to the train operator's reaction time. *Id.* at 280-81.

In the present case, Mr. Bellizzi's opinion regarding PRT suffers from the same flaws recognized in *Dibble*.[7] Specifically, at his deposition, Mr. Bellizzi stated that the PRT he applied in this case was based on both his prior experience and studies used by human factors experts he has worked with in other cases. (Dkt. No. 50, Attach. 3, at 62:11-22 [Bellizzi Dep.].) However, Mr. Bellizzi was unable to supply information regarding these experts, or the studies, and stated that he did not review any documentation before applying the 1.0-1.2 PRT in this case. (*Id.* at 62:23-63:23.) Furthermore, Mr. Bellizzi acknowledged, as he did in *Dibble*, that PRT varies depending on a person's age due to motor skills and experience in similar situations. (*Id.* at

---

[7] The Court notes that New York state courts continue to apply the standard from *Frye v. U.S.*, 293 F. 1013 (D.C. Cir. 1923), when determining the admissibility of expert opinions. As many courts have recognized, *"Daubert* imposes a less stringent standard than its predecessor, *Frye." U.S. v. Barnes*, 04-CR-0186, 2008 WL 9359653, at *3 (S.D.N.Y. Apr. 2, 2008); *U.S. v. McCluskey*, 954 F. Supp. 2d 1224, 1238 (D.N.M. 2013) (stating that *Frye* is a more restrictive and elevated standard than *Daubert*).

102:13-103:21.)  Mr. Bellizzi clarified, however, that, so long as a person has "reasonable motor skills, it's not going to hinder you.  So it doesn't necessarily effect it." (*Id.* at 103:11-13.)  Yet, there is no evidence that Mr. Bellizzi interviewed Mr. Clark or reviewed anything else to determine whether these variables would effect Mr. Clark's PRT.

Perhaps most importantly, Mr. Bellizzi's report states that the PRT is based upon his "prior experience in numerous similar train accident cases." (Dkt. No. 50, Attach. 2, at 7-8.) "[W]hile experience can provide the basis to qualify a witness as an expert, the experience must be demonstrated and have direct relevance to the issues in the case." *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 98-CV-0082, 2005 WL 1074320, at *1 (W.D.N.Y. Feb. 9, 2005) (citing *Wilson v. Woods*, 163 F.3d 935, 938 [5th Cir. 1999]).  Moreover, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Glen. Elec. Co.*, 522 U.S. at 146. Here, Mr. Bellizzi testified that he has never worked as a train engineer or conductor or in any similar position.  (*Id.* at 17:6-18.)  Therefore, without any studies or practical experience operating a locomotive to support Mr. Bellizzi's proposed PRT, the Court finds that this opinion is arbitrary, impermissibly speculative, and unreliable.  Accordingly, the Court finds Mr. Bellizzi's opinion regarding Mr. Clark's purported PRT inadmissible.  *See Mercer v. S. Bend Snowmobiler's Club, Inc.*, 03-CV-0276, 2006 WL 3804884, at *5 (N.D. Ind. Dec. 22, 2006) (precluding expert opinion regarding PRT where expert did not provide any reliable principles or methodology for his conclusion).

**3.** **Whether Mr. Bellizzi's Opinion Regarding M.B.'s Ability to Extricate Himself From the Train's Path in 0.27 of a Second Is Sufficiently Reliable and Whether Mr. Bellizzi Is Qualified to Render Such an Opinion**

After carefully considering the matter, the Court answers both of these questions in the negative, in part[8] for the reasons stated in Defendant's Reply Declaration. (Dkt. No. 60, at ¶¶ 15-23 [Def.'s Reply Decl.].) To those reasons, the Court adds the following analysis.

As discussed above, Mr. Bellizzi opines that, had the train's brakes been applied 3.8 seconds before the collision, this would have afforded M.B. an additional 0.27 of a second to clear the train's path and that this would have been a sufficient amount of time for him to do so. (Dkt. No. 50, Attach. 2, at 8-9.) It is not disputed that M.B. disappears from view on the DVR an instant before impact. (Dkt. No. 50, Attach. 3, at 33:15-34:2.) Therefore, it is unknown what M.B. was doing at the precise moment of impact. (*Id.*) Nevertheless, Mr. Bellizzi opined that M.B. would have been able to escape the train's path based upon the physical mechanics of the accident. (*Id.*)

Specifically, Mr. Bellizzi testified as follows:

> The train hit him . . . First he was on the track, he was laying on the track, he was down on the track. Then the train came and hit him. And when the train hit him, the wheels of the train did not run him over. So the proportion of the train that's available to strike him is whatever the distance is from the wheel, where the wheels are, which is above the track to the outer left side of the train, and that distance is a very small distance. One to 2 feet. I don't have the diagram of the train to give you the exact distance, but it's a very short distance. So if he is going out of the way of the train, and he's in that one to 2-foot distance, if he had another quarter of a second or even less he would have cleared the train.

(*Id.* at 40:5-20.)

---

[8]    The Court declines Defendant's invitation to take judicial notice of the fact that Usain Bolt is the fastest human in the world for purposes of comparison in determining whether M.B. could have extricated himself from the train's path. (Dkt. No. 60, at ¶¶ 17-19 [Def.'s Reply Decl.].)

When questioned further, Mr. Bellizzi testified that he had not reviewed pictures or diagrams depicting the front of the train (*id.* 35:3-7); he did not know how wide the locomotive was (*id.* at 36:3-4); he did not know the width of the rails (*id.* at 92:2-3); he had not visited the site of the accident (*id.* at 15:24-16:2, 23:4-6); he had not spoken with M.B. regarding the accident (*id.* at 23:9-14); and he did not review M.B.'s medical records because Mr. Bellizzi did not believe M.B.'s injuries were important in determining what part of the train struck M.B. (*id.* at 37:14-16, 38:13-39:2). Similarly, Mr. Bellizzi did not know M.B.'s height or weight because he did not think these characteristics would have an effect on how long it would take M.B. to clear the train's path. (*Id.* 43:2-9.) When asked again to provide a basis for this opinion, in the form of a study or scientific literature, Mr. Bellizzi stated,

> There is no study or report per se, but if he's in that one to 2-foot area between the rail and the side of the train, whether there is a cow catcher or not a cow catcher, and he's trying to get away from the train, and whether he's rolling or jumping or standing or moving or walking, he could have done so in a quarter of a second.

(*Id.* at 89:12-21.) Having reviewed Mr. Bellizzi's deposition and expert report, the Court finds that Mr. Bellizzi's opinion on this issue is more a conclusory assertion than an opinion. Mr. Bellizzi completely fails to offer any basis for his opinion, scientific or otherwise, which supports the notion that M.B. could have moved out of the train's path had he been afforded an additional 0.27 of a second.

Moreover, the Court does not believe that Mr. Bellizzi is qualified to render such an opinion. In *Nna v. Am. Standard, Inc.*, 630 F. Supp. 2d 115 (D. Mass. 2009), the court dealt with a strikingly similar issue regarding whether two experts, a licensed engineer who was also an accident reconstructionist, and a professional engineer, were qualified to opine as to the amount

of time it would take for a railroad crew to move out of a train's path. *Nna*, 630 F. Supp. 2d at

136-37. There, the experts sought to opine about the issue of causation in a train accident

involving a railroad work crew that was on the tracks. *Id.* The defendant took exception to the

experts attempt to opine that the workers would have had sufficient time to escape the oncoming

train had the train's horn sounded properly when it was activated 60-70 yards away. *Id.*

With respect to the first expert, the court held that

> [the expert's] conclusion regarding the sufficiency of the time for
> the workers to escape the oncoming train, on the other hand, draws
> him into the field of human factors analysis. There is no indication
> from [the expert's] qualifications that he has any expertise in
> determining how long it takes an individual to make a certain
> series of movements. Nor is there any indication from [the
> expert's] report that he ever even *attempted* to make such a
> calculation in this case. Rather, having determined that the work
> crew would have had approximately 1.5-2.6 seconds to move
> away, [the expert] simply leaps to the conclusory assertion that
> "[g]iven the maximum distance of 4.625 feet to completely avoid
> contact with the train, it is much more likely than not that these
> men would have been able to reach a point of safety in the time
> available."

*Id.* at 136. The court concluded that "[i]n the absence of any identifiable methodology, beyond

[the expert's] general impression of how quickly experienced railroad employees can move, his

conclusion as to the sufficiency of the time to move away is not admissible as an expert

opinion." *Id.* at 136-37.

Similarly, here, Mr. Bellizzi's *curriculum vitae* is devoid of any indication that he has

received any training, education, or experience in an area such as human factors analysis that

would allow him to determine the minimum time required for M.B. to clear the train's path.

(Dkt. No. 58, Ex. A., at 23.) *See also Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222,

227 (N.D.N.Y. 1994) (holding that "[a]n expert must, however, stay within the reasonable

confines of his subject area, and cannot render expert opinion on an entirely different field or discipline.") (citing *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 [10th Cir. 1991].) Here, as in *Nna*, there is no indication that Mr. Bellizzi has attempted to perform such a calculation, nor has he identified any methodology in support of his opinion. Rather, Mr. Bellizzi appears to have merely calculated that M.B. would have had 0.27 of a second in additional time if the train braked earlier, and then jumped to the conclusion that this would have been sufficient for M.B. to move out of the way. However, the Court agrees with Defendant and finds that Mr. Bellizzi is not qualified to render such an opinion nor is his opinion, as presented, sufficiently reliable to be deemed admissible.

### B. Defendant's Motion for Summary Judgment

Because Plaintiffs' opposition to Defendant's motion for summary judgment hinges on the admissibility of their expert's opinions, and because the Court has decided to exclude those opinions, Defendant's motion for summary judgment should be granted. *See Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247, 254 (S.D.N.Y. 1997) ("It follows from the exlusion of Kaufmann's opinion evidence that Toastmaster's motion for summary judgment must be granted."); *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986). However, in the interest of thoroughness, the Court will address the legal arguments asserted by Defendant in its motion for summary judgment. The Court notes, once again, that Plaintiffs' did not respond to these specific arguments in their opposition to Defendant's motion. Accordingly, Defendant's burden with regard to their arguments is lightened, such that, in order to succeed on these arguments, Defendant need only show that their arguments possess facial merit. *See Cossey v. David*, 04-CV-1501, 2007 WL 3171819, at *7 (N.D.N.Y. Oct. 29, 2007) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are

deemed to have consented to defendants' argument, and thus defendants must only satisfy "their

modest burden of demonstrating entitlement to the relief requested through that argument");

*accord*, *Saunders v. Ricks*, 03-CV-0598, 2006 WL 3051792, at *9 (N.D.N.Y. Oct. 18, 2006).

At the very least, Defendant has met that modest threshold burden. In any event, the Court

would grant Defendant's motion for summary judgment even if it were to subject that motion to

the more rigorous scrutiny appropriate for a contested motion.

> 1.  **Whether a Genuine Dispute of Material Fact Exists Regarding Defendant's Alleged Negligence in Failing to Erect Fencing or Warning Signs in the Vicinity of the Area of the Accident**

After carefully considering the matter, the Court answers this question in the negative for

the reasons stated in Defendant's memorandum of law. (Dkt. No. 50, Attach. 6, at 18-22 [Def.'s

Mem. of Law].) To those reasons, the Court adds the following analysis.

"Under New York law, the elements of a negligence claim are: (1) a duty owed to the

plaintiff by the defendant; (2) breach of that duty; and (3) injury substantially caused by that

breach." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002). With

respect to the first element, New York no longer frames duty of care in terms of the status of an

entrant on another's property, such as invitee, licensee, or trespasser. *Basso v. Miller*, 40 N.Y.2d

233, 241 (1976). However, as the New York Court of Appeals has stated, "[w]hile status is no

longer determinative, considerations of who plaintiff is and what his purpose is upon the land are

factors which, if known, may be included in arriving at what would be reasonable care under the

circumstances." *Basso*, 40 N.Y.2d at 241.

"Accordingly, the law has developed such that it recognizes a higher duty of care where

the railroad has knowledge of a person's entry and the scope of the duty expands in relation to

the knowledge. Knowledge need not be actual but may be imputed through notice of an

-28-

entrant's presence." *Bowen v. Nat'l R.R. Passenger Corp.*, 363 F. Supp. 2d 370, 375 (N.D.N.Y. 2005) (citing *Fuentes v. Consol. Rail Corp.*, 789 F. Supp. 638, 641 [S.D.N.Y. 1992]). "As one would expect, the scope of duty owed contracts where a railroad lacks such knowledge and has a reasonable expectation that persons will not be present on its right of way." *Bowen*, 363 F. Supp. 2d at 375. Yet, "[d]espite the miles of tracks that pass through populated areas, trespassers are not presumed to be inevitable entrants and deemed legally anticipated. On the contrary, they are legally sanctioned under N.Y. R.R. Law § 83 which prohibits anyone not associated with the railroad from walking on or along the tracks." *Id.*

Although Plaintiffs have not addressed this issue in their opposition memorandum of law, Mr. Bellizzi notes in his report that "[t]he areas on both sides of the track were not fenced." (Dkt. No. 50, Attach. 2, at 6 [Bellizzi Expert Report].) In addition, Mr. Bellizzi states that the photographs "illustrated foot paths tracked in the snow across the subject track area." (*Id.*) Based upon a review of the photographs, Mr. Bellizzi opined that

> [t]he location where [M.B.] was crossing the train tracks was frequently used by pedestrians to cross the tracks. Visible pedestrian tracks across the railroad right-of-way were clearly visible indicating that it would have been known and well recognized track crossing area giving train operators an expectation and anticipation to look for pedestrians crossing in this area.

(*Id.* at 8-9.) Mr. Bellizzi also appears to suggest that CSX should had have fences erected to prevent the public from using the railroad tracks in this area. (Dkt. No. 50, Attach. 3, at 106:15-107:2 [Bellizzi Dep.].)

Conversely, Defendant argues that M.B. was a trespasser and there was no prior notice to CSX that pedestrians regularly crossed the tracks in this area. (Dkt. No. 49, Attach. 23, at 24-25 [Def.'s Mem. of Law].) Moreover, Defendant argues the photographs that Mr. Bellizzi relied

upon in forming his opinion were provided by Plaintiffs' counsel but that Plaintiffs do not know

who took the photographs, when they were taken, and what they were taken of. (Dkt. No. 60, ¶¶

21-23 [Def.'s Reply Decl.].) Therefore, because the photographs are not admissible and Mr.

Bellizzi has not visited the accident site, Defendant argues that Mr. Bellizzi's opinion is

unreliable and speculative. (*Id.* ¶ 23.)

The Court finds the suggestion that Mr. Clark, the train operator, should have known that

members of the public regularly crossed the tracks in the area of the accident to be unpersuasive.

First, Mr. Clark testified at his deposition that, before the accident, he has operated a locomotive

through the area many times. (Dkt. No. 49, Attach. 7, at 30:2-6; Dkt. No. 49, Attach. 8, at 57:25-

58:4.) However, Mr. Clark had never seen anybody cross the tracks before the accident. (Dkt.

No. 49, Attach. 8, at 58:7-20.) Similarly, M.B. testified that he had never seen a train on the

tracks in the area of the accident when he had crossed the tracks on prior occasions. (Dkt. No.

49, Attach. 5, at 35:13-17.)

Second, upon reviewing Defendant's Notice to Admit (Dkt. No. 60, Attach. 4 [Def.'s

Notice to Admit), Plaintiffs' response thereto (Dkt. No. 60, Attach. 5), Defendant's letter

correspondence to Plaintiffs advising of their inadequate response to Defendant's Notice to

Admit (Dkt. No. 60, Attach. 6), Mr. Bellizzi's testimony that his opinion regarding the snow

tracks was based solely upon his review of the photographs (Dkt. No. 50, Attach. 3, at 79:15-18),

and the failure to establish when the photographs were taken (*id.* at 43:18-47:25), the Court

agrees with Defendant that the photographs are not sufficiently reliable to support Mr. Bellizzi's

opinion that the tracks were regularly crossed by pedestrians, such that Defendant should have

been on notice of same.

Finally, the Court finds, in any event, that the alleged failure to erect fencing or to place warning signs was not the proximate cause of M.B.'s accident. Specifically, M.B. testified that he had crossed these tracks on prior occasions (Dkt. No. 49, Attach. 5, at 35:13-17; Dkt. No. 49, Attach. 6, at 24:11-17) and knew that the tracks were used by trains on a regular basis (Dkt. No. 49, Attach. 6, at 24:18-22.) M.B. also testified that, before the accident, he knew that train tracks are dangerous. (Dkt. No. 49, Attach. 6, at 58:9-12.) Nonetheless, M.B. testified that, on the day of the accident, he intended to beat the train. (Dkt. No. 49, Attach. 6, at 29:3-9.)

It has been held that "'the absence of a warning sign cannot be excluded as a cause unless the plaintiff's awareness of the condition would have lead to the same course of conduct as if the sign had been present.'" *Leiching v. Consol. Rail Corp.*, 901 F. Supp. 95, 99 (N.D.N.Y. 1995) (quoting *Vasquez v. Consol. Rail Corp.*,180 A.D.2d 247 [N.Y. App. Div. 3d Dept. 1992]); *see also Rowell v. Town of Hempstead*, 186 A.D.2d 553 (N.Y. App. Div. 2d Dept. 1992). In *Leiching*, the court held that the failure to erect warning signs on a railroad track was not the proximate cause of plaintiff's accident since "the plaintiff admitted to already having specific knowledge of the dangers he faced with respect to walking on the tracks. Notwithstanding that knowledge, the plaintiff, by his own admission, repeatedly disregarded the danger and walked on the tracks. No sign would have warned plaintiff about anything that he did not already have knowledge." *Leiching*, 901 F. Supp. at 95. Similarly, here, M.B. clearly had knowledge that the tracks were dangerous before the accident and warning signs would have had little, if any, effect on his decision to cross them.

With respect to a duty to fence, "[a]bsent a statutory requirement, railroad owners do not have a duty to fence their property to prevent trespassing." *Bowen*, 363 F. Supp. 2d at 378 (citing *Munger v. Tonawanda R. Co.*, 4 N.Y. 349 [N.Y. 1850]); *see also Leone*, 2008 WL 828125, at

*12 ("[I]t appears that New York's Court of Appeals long ago answered 'No' to the question of whether a railroad had a duty to erect fencing in order to prevent a child from wandering onto its tracks and being killed.") (citing *DiCaprio v. N.Y. Cent. R. Co.*, 231 N.Y. 94, 98 [N.Y. 1921]). Here, as in *Leone*,

> there is no evidence that CSX was required by statute, regulation, administrative order or common law to erect signs in or fence the area where the accident occurred. Moreover, there is no evidentiary proof in the record which demonstrates that the alleged failure of CSX to erect warning signs or fencing in the area where the collision occurred was the proximate cause of the accident.

*Leone*, 2008 WL 828125, at *12.

### 2. Whether a Genuine Dispute of Fact Exists Regarding the Proximate Cause of the Accident With Respect to the Train's Failure to Slow Down/Stop and M.B.'s Reckless Conduct

With respect to a train operator's duty to act when a pedestrian is seen near a railroad track, the Second Circuit has stated "'[i]t is the established ["open-run"] rule in New York . . . that when a train engineer sees a person on or near the track, he is not bound to stop his train immediately, but has the right to assume that in broad daylight, the person will see and hear the train, heed the danger, and leave the track.'" *Raspente v. Amtrak*, 111 F.3d 239, 242 (2d Cir. 1997) (quoting *Alba v. Long Island R.R.*, 204 A.D.2d 143 [N.Y. App. Div. 1st Dept. 1994]); *see also Leone*, 2008 WL 828125, at *5; *Chrystal v. Troy & B.R. Co.*, 105 N.Y. 164 (N.Y. 1887); N.Y. PJI 2:176. Furthermore, "[o]nce it becomes apparent to [an] engineer that the person on the tracks cannot or will not remove himself from harm's way, the engineer has a duty to make an emergency stop." *Raspente*, 111 F.3d at 242 (citing *Alba*, 611 N.Y.S.2d at 197).

As discussed above, it is undisputed that the train was traveling approximately 38 mph when it approached the area of the accident. It is also undisputed that the train's bell had been

ringing continuously for two minutes and twenty seconds before the collision and Mr. Clark sounded the train's horn seconds before impact.[9]  Due to the short period of time that elapsed between M.B. appearing from the woods and when the accident occurred, and because Mr. Bellizzi's opinions regarding causation have been precluded, the Court finds that Defendant has established its entitlement to summary judgment.

In any event, the Court agrees with Defendant that M.B.'s reckless conduct was the proximate cause of the accident.  (Dkt. No. 49, Attach. 23, at 11-17 [Def.'s Mem. of Law].) New York courts have held that "[a] plaintiff's intervening conduct . . . can break the chain of causal connection between a defendant's breach of duty and an ensuing injury to a plaintiff so as to relieve a defendant from liability for negligence.  Moreover, where a party merely furnishes the occasion for an accident but does not cause it, liability may not be imposed." *Portelli v. Garcia*, 195 Misc. 2d 217, 221 (N.Y. Sup. Ct. Nassau Cnty. 2003) (citing *Katz v. Klagsbrun*, 299 A.D.2d 317 [N.Y. App. Div. 2d Dept. 2002]).  This has been applied in the context of railroad accidents in several cases.  *See Mooney v. Long Island R.R.*, 305 A.D.2d 560 (N.Y. App. Div. 2d Dept. 2003) ("The sole proximate cause of the infant plaintiffs' injuries was their reckless behavior in proceeding around a safety gate in the down position and crossing the tracks directly behind an eastbound train without first checking to see if a westbound train was approaching.");

---

[9]     The Court notes that M.B. testified he did not hear the train's horn before the accident (Dkt. No. 49, Attach. 5, at 34:11-15) and that he later changed this testimony, stating that he did not recall hearing a bell or horn (Dkt. No. 49, Attach. 6, at 29:21-30:2.)  This is insufficient to create a genuine dispute of material fact, however, because the train's DVR and event recorder establish that the bell was on and the horn was sounded before the collision.  This data has not been disputed by Plaintiffs.  *See Woods v. CSX Transp., Inc.*, 07-CV-0030, 2008 WL 5070352, at *14 (N.D. Ind. Nov. 24, 2008) (holding that plaintiff's statement that he did not hear train's horn did not create a genuine issue of material fact as to whether the horn was sounded because data from train's event recorder corroborated engineer's testimony that it was sounded) (citing *Miller v. Illinois Cent. R.R. Co.*, 474 F.3d 951 [7th Cir. 2007]).

*de Pena v. NYCTA*, 236 A.D.2d 209 (N.Y. App. Div. 1ˢᵗ Dept. 1997) ("The recklessness of this

activity [electrocution of 13-year-old boy by railroad track after he snuck down into subway]

should have been so obvious, even to City lads of such tender age, that the case should have been

dismissed before trial . . . compensation should not be granted where the proximate cause of

death or injury is an individual's own willful behavior in engaging in hazardous and illegal

conduct."); *Gao Yi Feng v. Metro. Transp. Auth.*, 285 A.D.2d 447 (N.Y. App. Div. 2d Dept.

2001) (finding that plaintiff's conduct in standing immediately next to active train tracks while

facing away from oncoming train traffic was a "superseding cause necessarily relieving the

defendants of liability"); *Prysock v. Metro. Transp. Auth.*, 251 A.D.2d 308 (N.Y. App. Div. 2d

Dept. 1998) (holding that a motorist's conduct in driving her car onto railroad tracks, when

backed-up traffic did not leave her room to safely pass over them, was an intervening and

unforeseeable action which broke any causal nexus between injuries she sustained in collision

with train and any alleged negligence on part of train operator and railroad); *Guller v. Consol.

Rail Corp.*, 242 A.D.2d 283 (N.Y. App. Div. 2d Dept. 1997) (holding that railroad cannot be

reasonably deemed negligent for failing to anticipate that plaintiff would leap forward into the

path of a train when it was just 5 or 10 feet away).

Once again, in the present case, M.B. testified he knew, before the accident, that train

tracks are dangerous. Furthermore, M.B. testified that, on the day of the accident, he saw the

train from 50 yards away. (Dkt. No. 49, Attach. 6, at 25:25-26:7.) Despite seeing the train, M.B.

decided to try to beat it. (*Id.* at 29:3-9.) Based upon these facts, the Court agrees that M.B.'s

reckless conduct was the sole proximate cause of the accident. Accordingly, Plaintiffs have

failed to establish a genuine dispute of material fact regarding Defendant's alleged negligence.

Therefore, Plaintiff Maureen Scott's claim for loss of filial consortium is also dismissed. *See*

*Gerzog v. London Fog Corp.*, 907 F. Supp. 590, 605 (E.D.N.Y. 1995) (holding that "a claim for loss of consortium is a derivative claim which does not exist separate and apart from the injured spouse's claims"); *Hassanein v. Avianca Airlines*, 872 F. Supp. 1183, 1190 (E.D.N.Y. 1995) (granting summary judgment regarding claim for loss of consortium to the extent that the claim was based on injured spouse's claim for emotional injuries which were also dismissed); *Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 492 (S.D.N.Y. 2004) ("A parent may not recover damages for loss of consortium as a result of injuries to the child due to negligence.") (collecting cases).

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion to preclude (Dkt. No. 50) is **GRANTED**; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 49) is **GRANTED**. The Clerk of the Court is directed to enter judgment in favor of the Defendant and close this case.

Dated: September 11, 2015
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge